We turn now to our third case of the morning, Appeal Number 24-1440, Metroplex Communications v. Meta Platforms. And we welcome to the bench retired Judge Feinerman. Good morning. Good morning. May it please the court, counsel, I'm Gary Feinerman on behalf of the defendant, appellant, Meta Platforms. Metroplex's suit alleges that Meta made false statements about the estimated audience for Facebook ads. So the suit is about buying ads on Facebook. The arbitration provision in Meta's commercial terms, to which Metroplex agreed, broadly covers claims that pertain to the buying of ads on Facebook. The provision applies to any claim that relates to any access or use of the Meta products for business or commercial purposes. And the terms define business and commercial purposes to include using ads. So Metroplex's claims relate to the use, relate to any access or use of Meta's products, here Facebook ads, because they rest on the premise that customers who are buying ads bought ads on Facebook rather than on any of Metroplex's properties. So based on the plainest reading of the arbitration provision, those claims fall within the scope of the provision. The district court disagreed, and it disagreed by reading an implied by you into the definition of commercial claims. Instead of reading the arbitration provision to apply to claims that relate to any use of Facebook ads, the district court read the provision to apply only to your use, meaning Metroplex's use, of Facebook ads. And that ignores the provision's text, which says any, not yours. And the text is not limited to Metroplex's use of the Facebook ads. And it's important, I think, to distinguish Section 5A from Section 5B, and they're both in the disputes provision of the commercial terms. It's on page 265 of the joint appendix. And what it shows is that when the parties intended a provision to be limited to the user's use of Facebook ads, meaning here Metroplex's use of Facebook ads, it knew how to do so. So Section 5A has to do with third-party claims. And what it does is it provides that the user has to indemnify META for third-party claims brought against META that relate to your use of the META products. Not any use, meaning use by anybody, but your use, meaning use by the party to the commercial terms. Here Metroplex. Section 5B, by contrast, along with Sections 5C and 5D, pertain to first-party claims involving the user and META, and unlike Section 5A, it covers claims related to any use, any use of those products, meaning use by anybody. And so under standard interpretive principles, even without the overlay of the FAA's presumption in favor of arbitration, but particularly given the overlay of the FAA's presumption, the Section 5B refers to any use and not just Metroplex's use. Before you continue with your textual arguments, can we back up for a minute? Of course. Is there anywhere in the record where META admits to purchasing ads through, where Metroplex admits to purchasing ads through META for its clients? Because I'm seeing different spots, but they don't seem to be concessions or actual admissions that they, Metroplex purchases these ads. Metroplex is kind of squirrely about whether or not it purchased ads. I think if you look at the Pricer Declaration, which is at Joint Appendix 109 to 122, and in particular, I'm sorry. You said 109? I'm sorry. That's not the, that's not, the Pricer Declaration is, I'm sorry, Joint Appendix 138 through 142. It lays out why the evidence of record shows that Metroplex had Facebook pages on Facebook. It had commercial pages, one for its radio station and the other for its news property. And it establishes that ads were purchased in order to advertise those Facebook pages, those radio stations, and those ad properties. And then the question that Metroplex never answers is who would have bought those ads, who would have agreed to the commercial terms on behalf of Metroplex if it weren't Metroplex? And what the Pricer Declaration does is it connects the dots between the purchase of those pages on behalf of Metroplex. Okay. But you would agree we definitely don't, we don't see this in the complaint. And at most, when they respond at the hearing, it was the April hearing, April 2023 hearing, they admit they purchase ads on behalf of their clients. Right. But not that specifically that they do it through Meta. They do purchase ads on behalf of their clients, and the evidence in the Pricer Declaration shows that they purchase ads not only on behalf of themselves, but also on behalf of their clients. And I think if you look at that. Mr. Feinerman, can you connect that, though? Because the amended complaint has, I think, no allegations about Metroplex as an account user or a consumer, correct? It's always as a competitor. And so Metroplex could have, the fact that they purchased ads, if they did, really has nothing to do with this lawsuit, does it? It does. And it does for two reasons. One is it's covered by the arbitration provision. And I think, let's take a step back and think about, one, it's covered by the arbitration provision. Even under our understanding of the arbitration provision, which it applies to any use of the Facebook ads, regardless of whether it's by Metroplex or third parties. But even under a narrow understanding, even under Metroplex's understanding of the provision, the claims also relate very directly to Metroplex's own use of the Facebook ads. And I think it would be helpful to kind of take a step back and think about the commercial relationship here. I sense that Metroplex is asking, and perhaps that prompts your question, why would Metroplex agree to an arbitration provision that covered anybody's claims relating to anybody's use of Facebook ads, rather than just its own? It's a commercial relationship. Placing ads on Facebook is very, very valuable to businesses. That's why Metroplex did it. And in exchange for that access to Facebook's platform, the purchaser of the ads here, Metroplex has to pay money. It also has to agree to a number of non-monetary provisions. Limitation of liability, which is on Section 4, covering indemnifying for third-party claims, Section 5A, and arbitration, which is Section 5B. And Section 5B, read textually and correctly, particularly under the FAA's presumption, covers any access or use to the Facebook platform, and not just Metroplex's. But let's say you disagree with me on that, and I hope you don't. Even accepting the district court's atextual limitation on the provision's text, Metroplex's claims necessarily relate to its own use and purchase of Facebook ads. If this case remains in court, Metroplex is going to be the star of the show, whether it's an individual case where there's only one plaintiff, or whether it's a class action where Metroplex is the named plaintiff. And Metroplex's purchase of its own ads on Facebook and the placement of ads on Facebook, not only for itself, but as it admitted in front of Judge Dugan, on behalf of its clients, are directly pertinent to its claims, both liability and damages. I'll quickly go through them. In terms of liability, one element of Metroplex's claims is that Meta's allegedly false statements were material to ad buyers. So what Metroplex is alleging is that if the ad buyers had only known that Meta was exaggerating the reach of Facebook ads, it wasn't, but let's just assume that it was, the ad buyers would have impacted the ad buyers' decisions whether or not to buy ads on Facebook. And that's at paragraphs 367, 377 to 388 of the complaint. That plainly implicates Metroplex's own ad purchasing behavior. In particular, it's continuing to purchase ads on Facebook after 2018, when the DZ Reserve case was filed in federal court in California. But can we talk a little bit, I noticed that you acknowledged page 22 of your reply brief. I'm sorry? Yes, I noticed on page 22 of your reply brief, I think it's footnote two, there's a reference to the Viking River Cruises case. Right, yes. And so you know where I'm headed with this question. I do. What is the causal connection between the commercial terms of this contract, particularly on page 265, and the Latham Act suit that Metroplex is bringing here? I'm trying to connect just so that we're in keeping with the Viking River Cruises case. Right. I'm not sure. The Viking River Cruises reference to section two was in a footnote. And I'm not sure that the Supreme Court meant anything other than whatever causal relationship is required by section two, it was satisfied in the Viking Cruise case. But in terms of, is your question, why does this provision read in our way fall within the scope of section two? Yes. Right. So section two states that a written provision in any contract evidencing a transaction involving commerce to settle by arbitration, a controversy thereafter arising out of such contract or transaction, shall be valid, irrevocable, and enforceable. And so what section two lays out are about four or five tickets that have to be covered by section two. It has to be written. It has to be in a contract. The contract has to evidence commerce and what back in 1925, what they meant by that was it has to be an interstate commerce. And it has to settle by arbitration a controversy arising out of such contract or transaction. And if all those tickets are punched, then the provision. How is it this particular claim arising out of? I think that's where the disconnect is.  I'm going to, in terms of the premise of your question, I'm going to say that that question speaks to the breadth of section two. Section two does not apply. So I guess I'm questioning the premise of your question, if you'll allow me. Section two doesn't operate on claims. It doesn't say claims are subject to arbitration if this, that, and the other thing. It says a written provision is subject, is enforceable if it does this, that, or the other thing. So as long as the written provision has a hook, that does apply to claims. And that's why I'm pushing back a little bit to say what is the hook when I'm particularly disputes looking at this contract here.  And it limits it to, we're using this word any. Right. And we're using it in section 5B, for example. Are we using the natural reading of that word any for 5A and 5C that come right before it and right after it? Right. Absolutely. It's because any means any and your means your. And in terms of section two, though, as long as the provision encompasses claims that arise out of the contract, it's in FAA land. And once a provision is in FAA land, it's enforceable, certainly to the extent that it covers claims arising out of the contract, but also if it pertains to claims that arise out of different sources of law, different contracts like in Gore or Carr's notion, or different statutes like Epic Systems, which is the FSLA and American Express, which are those claims arise out of the Sherman Act. If the very narrow reading of arising under were correct, and no court has read section two that narrowly, not even Calderon in the 11th Circuit, then all of those cases, it would wipe away a broad swath of cases that applied section two of the FAA to claims that did not arise directly out of the contract. And I see that I'm out of time. You can finish your thought. Sure. So the best way to read section two is it basically creates an entry pass into section two. As long as the provision does cover, part of the provision covers claims that arise out of the contract, then it can carry everything else, all other claims with it, that are covered by the text of the provision, and that's illustrated by the cases that I just mentioned. Thank you. We will welcome Mr. Gelfand. Good morning, and may it please the Court. The district court in this case correctly held that the arbitration agreement at issue does not apply to this Lanham Act case, this unfair competition case, brought by a company wearing the hat of a competitor of Meta, the competitor of Facebook, as opposed to the hat of a customer, a consumer of Meta. But even if this court were to read this arbitration agreement in a way that we believe would be incorrect but consistent. Mr. Gelfand, I'm sorry. Are you conceding that Illinois contract law applies here? Yes, Your Honor. We believe Illinois contract law applies here, and we believe Illinois contract law supports our interpretation of this contract. To be clear, and this was drew at the lower court below, there was no real dispute between whether Illinois or California contract law applies because it doesn't really affect the ultimate analysis in this case. For purposes of our analysis, Illinois law? Yes, Your Honor. To be clear, for purposes of this court's analysis, Illinois law applies to the contractual interpretation, but of course the FAA choice of law provision applies for purposes of how this court interprets and enforces the contract. I understand how it works. I just need to know which state law you're going with. Illinois, Your Honor. Thank you. And so with respect to the FAA, the underlying question is does this dispute, does this lawsuit that we brought in this case on behalf of Metroplex arise out of the contractual relationship? To that point, the U.S. Supreme Court in Viking River Cruises did not inadvertently put a footnote in that has no legal significance, emphasizing that there has to be a causal connection. But even if this court were to look no further than its own precedent in the Gore case, then the question becomes does this dispute have its origin or genesis in the provision at issue? These unfair competition claims that are the heart of this case, the subject of the first amended complaint, do not arise out of Metroplex's use or access of Facebook. They arise irrespective of any customer relationship or agreement between Metroplex and Meta. And the reason why is because the theory that we're dealing with here, the issues that we're litigating in this case, focus entirely on the false statements that Meta made in commerce as it relates to the number of people using Facebook, the audience size, everything that's at the heart of what's alleged in the first amended complaint. To that end, to be clear, Meta's argument is not, as Judge Feinerman suggests, the plainest reading. As the district court correctly heard, the plainest reading of the arbitration agreement at issue is the reading that is consistent with Section 2 of the FAA, which the parties expressly in this provision agreed governs not only the enforcement but the interpretation of this contract. And that means that any refers to any access or use, any method of using, any number of times it's used, but not to anybody's use. The irony of this is that it's Meta that's actually asking the court and ask the district court below to essentially replace the word any with its own word anybody's. And there's no basis to do so. Now, Judge Feinerman keeps referring to this so-called presumption of arbitration. I wanted to hit that right at the outset, because as the U.S. Supreme Court and this court has repeatedly held in the context of this very issue, as it applies to what we're litigating here before this court, the policy is to make arbitration agreements as enforceable as other contracts, but not more so. That's word for word with the U.S. Supreme Court said in the Morgan case. This court in the Johnson case just two years ago, in 2022, referenced a defense argument similar to the argument that's being brought before this court this morning, that the FAA requires that arbitration agreements be generously construed and that all doubts be resolved in favor of arbitration. And what this court says is, that is not, however, what the statute says. In other words, the FAA requires arbitration agreements to be treated just like other contracts. And this court referenced 9 U.S.C. Section 2, in other words, Section 2 of the FAA, that's at the heart of our argument. That's consistent with what this court held in 2003 in the Stone case, saying nothing in the FAA overrides normal rules of contractual interpretation. So ultimately, the bottom line takeaway here is that this is a reaction to perhaps a long time ago, a view that arbitration agreements should somehow be disfavored. And what the body of law holds, what the clear authority, both at the Supreme Court level and at this court level, stands for is a very simple premise, which is arbitration agreements should not be read in a way that are different from any other contracts. They shouldn't be interpreted more favorably to reach a particular result or less favorably to reach a particular result. One of the things that we're confronting is when a party, or he or your opposing party, offers a contrary interpretation of a clause, when does that rise to a plausible interpretation that creates ambiguity that is, as you would agree, if there's ambiguity under our law, it pushes us to arbitration. So where on that sliding scale should we find ourselves or root ourselves between someone's plausible reading and where we go from there? It's a good question, Your Honor, but I think in this case, the premise I would push back on is that I don't believe there's actually any ambiguity as the district court correctly held in the contract in this case. And one of the reasons why is not only the contract provision itself, which clearly refers to any access or use by the parties that entered into the contract, in this case Metroplex and Meta, but also that the contract itself incorporates that the FAA is the guiding post here that applies for both interpretation and enforcement. And the reason there's no ambiguity and the reason that's relevant here is that our interpretation of the contract, for lack of a better phrase, is the only way to reconcile the contract language itself and Section 2 of the FAA, that they both deal with limiting arbitration to disputes that arise out of, that's the statutory language Congress used, and the language in Facebook's contract here is that arise out of or relate to the use of Meta's platform, meaning Facebook for these purposes, for purposes of business or commercial use. And so this is not a scenario where there's ambiguity. I would also urge the court that when, to the extent that the court believes, notwithstanding our position, that there is some ambiguity, then normal rules of contract interpretation should apply to try to figure out what was the party's ultimate intention here with respect to this contract. And so the solution is not what Meta essentially argues in its own way, which is let's just jump to there's some abstract ambiguity in some esoteric manner, let's now immediately say arbitration. Then we resort to all these other tools, and that's all they are, to interpret what was ultimately the intent between the parties. And that, Your Honor, is where the reconciliation between the agreement within the contract that the FAA applies to the interpretation and to the enforcement of the contract is critical. That's Section 5.C.2 of the contract itself. And so to that end, when we have a case as we have here where a competitor of Facebook is raising claims that exist irrespective of whether that competitor happens to at some point in the past had a Facebook page, that falls outside the scope not only of the plain language of the arbitration agreement that we're dealing with here, but it also falls outside the scope of the FAA itself. And that's where the district court should be affirmed on its face. But what's interesting is even if this court were to say, no, we read the contract differently from the district court, then it falls outside the scope of the FAA, and then it begs the question of whether this court has jurisdiction on appeal if it's outside the scope of the FAA, consistent with precedent like International Board of Teamsters. In all candor, I don't think the court needs to get that far to some of these questions about jurisdiction because consistent with the district court's opinion, the contract itself just doesn't apply to these claims. Can you characterize or clarify the different types of clients that you are alleging to have lost because of meta statements? The parties are somewhat talking past each other about the contours of your theory. Yes, Your Honor. The underlying premise of this litigation, and of course this will be developed appropriately through discovery, is that there is an entire marketplace of ad buyers, people that purchase digital advertisements on platforms like Metroplex through its own platforms, like Facebook, and of course like a number of other, perhaps including some of the largest companies that exist. To that end, when Facebook does what it has done in this case, which is makes false statements about, for example, the number of people using Facebook, the number of monthly active users, the number of quantification of certain accounts, description of potential reads of metrics representing people, then that has an effect on any consumer that is purchasing ads. In this particular instance, Metroplex is wearing the hat not as a consumer purchasing ads, and that's what's so relevant to the issue before this court, but is wearing the hat exclusively as a competitor that, like Facebook, I'm using Facebook interchangeable with meta, but that like Facebook is selling advertisements and competing, so to speak, for the same consumers. And that's what really strikes at the heart of this case, because if this case were a case involving Metroplex's claim, by way of just a random example, if Metroplex hypothetically went on to Facebook as a consumer, purchased ads and claims, well, you didn't run my ads, then meta would have an argument that that arises out of this contractual relationship. But in this particular Lanham Act case, it's not only one step too far, it's about 100 steps too far, and that's exactly why the district court correctly ruled as it did. Now, furthermore, we're not trying to pave new ground. There's been some suggestion in the reply brief, and Judge Venderman alluded to it broadly today, that we're trying to basically create some novel legal theory. It's going to create some circuit splits, and that's not so. What we're arguing is consistent not only with the plain language of the statutory language at issue in 9 U.S.C. 2 that it arises out of, but it's also consistent with this court's precedent in case after case after case where the FAA was interpreted to involve disputes over contracts. I'm sure I'm pronouncing this wrong, but IBU Local. It's a dispute over a contract's grievance procedure. Gore, the claims have to be the origin or the genesis in the underlying contract. Falkenberg involved claims with a franchise agreement. United Steel was a breach of agreement. Exelon, a collective bargaining agreement set of violations. These are all contractually based disputes as opposed to the Lanham Act and parallel Illinois State Unfair Competition Act allegations that are at issue in this case. To that end, there is a threshold question that this court needs to address for Metta to that was asked to Metta as well, and that's what the record reflects with respect to Metroplex purchasing ads in the first place. And to be crystal clear, Metroplex is not being squirrely. That was the word that was used by Judge Finerman. This is Metta's burden to establish at the lower court level, and Metta failed to establish at the lower court level that there even is an enforceable arbitration agreement in the first place, putting aside everything else. This court, as recently as July of this year in the Walrich case, W-A-L-R-I-C-H, made it clear that the party seeking to enforce an arbitration agreement is the party that bears the burden. That's not new law. That's just reflecting what we could find as the most recent iteration of that legal standard. And so what this court is faced with is a contract itself where the plain meaning of the language, especially when reconciled with Article – I'm sorry, with Section 2 of the FAA, as interpreted, as incorporated within the statute itself – I'm sorry, within the contract itself, Section 5.C.2, that the FAA governs interpretation and enforcement of the contract. The way to reconcile that is the way that we're asking this court to read the plain language and to get to the ultimate meaning of the parties. That's consistent with the Supreme Court's footnote, but important footnote, in Viking River Cruises. It's consistent with this court's binding precedent in Gore, and it's consistent with everything else that the district court said below. And so for all of these reasons, if there are no more questions, we would ask the court to affirm the district court's decision. Okay. Thank you, Mr. Gelfand. Thank you. Judge Finerman, we'll give you two minutes. As to whether some rogue third party or elf or gnome bought Metroplex ads for Metroplex that were advertising Metroplex's property, I didn't hear counsel deny that Metroplex had bought ads for itself. Of course he couldn't. Okay. Because they did. I'm getting accustomed to the hypotheticals this morning. Everybody has one. So let's use a different one. We had the sweater before. Now we've got the elf and the gnome. So if we have the hypothetical delivery driver, okay? Right. Let's say using Meta's new smart glasses crashes into Metroplex's building. Right. The advertiser wants to sue Meta. Must it arbitrate? No. Why not? It comes down to the word related to. And, you know, there's the parable of the butterfly in Brazil flapping its wings causing a tornado in Texas. At some point the causal relationship gets too attenuated and something is no longer related to. And that's not the case here. The arbitration provision is about covers any access or use of Facebook ads. These claims pertain to the sale and purchase of Facebook ads. So there's a much, much tighter nexus here than there is in the glasses provision. But in terms of what the record shows, I just want to make perfectly clear, because the panel asked questions of both of us as to whether Metroplex bought ads. The answer is yes. I'd point the panel to paragraphs 25 through 29, I'm sorry, through 30, which is Joint Appendix 139 to 142. Very clearly shows that. In terms of whether there's still a presumption, United Natural Foods, after Morgan, after Johnson, held that there was, that's still good law. Morgan and Johnson did not eliminate that presumption without saying so. Thank you. Thank you. We thank both parties and we will take the case under advisement.